# In the United States District Court
## for the Southern District of Georgia
## Savannah Division

VIRGINIA COLLEGE, LLC,

    Plaintiff,

    v.

SSF SAVANNAH PROPERTIES, LLC;
POLE POSITION RACEWAY, INC.;
SAVANNAH RACEWAY, LLC; and P2R
KARTING, INC.,

    Defendants.

CV 415-010

## PRELIMINARY INJUNCTION

Someone thought it would be fine to install an indoor go-kart racetrack on top of a college. Because there is a substantial likelihood that the decision was not fine and, indeed, tortious, the Court grants, in part, the College's motion for a preliminary injunction.

Plaintiff Virginia College, LLC, operates a vocational college on the ground floor of what used to be a department store at the Savannah Mall. The Savannah Mall is owned by Defendant SSF Savannah Properties. Four years after the College moved into the space at the Mall, Defendant Pole Position Raceway entered into a lease with SSF to occupy the space

1

directly above the College and operate a go-kart racetrack.[1] The College claims that the incessant whirring, bumping, and vibrations caused by the racetrack hamper its educational mission and will cause irreparable harm to the College and its students if the nuisance is not immediately abated. The College has filed a complaint against Pole Position and the Mall, and has asked this Court to issue a preliminary injunction enjoining Pole Position from operating its racetrack at all times. Dkt. no. 2. The Court **GRANTS** the College's motion in part and **DENIES** it in part. A complete injunction would not be equitable, nor necessary: Pole Position is enjoined from operating its racetrack on weekdays (Monday through Friday) until the conclusion of the May 11, 2015 trial. In the interim, Pole Position may continue its normal operations on the weekends (Saturday and Sunday). Additionally, Pole Position may continue to operate the non-racetrack components of its operation, such as the videogames, pool tables, and concession stands, seven days a week.

This Order is not a decision on the merits. Instead, the Court addresses only the precise question before it: whether the College is entitled to the extraordinary remedy of a preliminary injunction. This Court cannot issue an injunction unless Plaintiff shows "that [it] is likely to suffer irreparable harm

---

[1] Throughout this Order, "Pole Position" will refer collectively to Defendants Savannah Raceway, LLC, Pole Position, Inc., and P2R Karting, Inc.

in the absence of preliminary relief." <u>Winter v. Natural Res.</u>
<u>Def. Council, Inc.</u>, 555 U.S. 7, 20 (2008). Because the College
has failed to show that Pole Position's continued weekend
operations will cause it irreparable harm, the Court denies its
motion to the extent that the College seeks to enjoin those
operations. However, after finding that continued operations
during the week will irreparably harm the College's educational
mission, the Court issues the injunction to that extent.

All Defendants have received notice and have participated
in the hearings prior to the issuance of this Order.

In ruling on Plaintiff's motion for a preliminary
injunction, the Court relies upon the following findings of fact
and conclusions of law.

### FINDINGS OF FACT

1. Plaintiff Virginia College ("the College"), an Alabama-
based for-profit school, leased approximately 51,781 square feet
of space in the Savannah Mall for use aT its Savannah Campus on
July 15, 2010. The Lease was for 15 years. Dkt. no. 1-2 ("VC
Lease").

2. The College leases the bottom floor of what used to be a
department store at the Mall. The escalators and other equipment
which connected the upper and lower floors of the department
store were removed and the floor sealed off prior to the College
leasing the space for its campus.

3

3. Section 3(g) of the College's Lease states:

[SSF] shall have the exclusive right to remodel, expand, contract or otherwise alter or change any portion . . . of [Savannah Mall] other than the Premises [leased to the College] . . . provided that such activities shall not materially interfere with [the College's] use. . . .

4. Section 11 of the VC Lease states:

[SSF] agrees that if Tenant shall perform all of the covenants and agreements herein to be required to be performed by Tenant, Tenant shall, subject to the terms of this Lease, at all times during the Term have peaceful and quiet possession of the Premises and the rights, easements and appurtenances thereto leased to Tenant hereunder. [SSF] represents to and covenants with Tenant that: . . . (e) [SSF] shall not enter into any covenants, easements or other agreements after the date of this Lease that prohibit or restrict Tenant's Permitted use or otherwise change the terms of this Lease without Tenant's prior written consent, which may be withheld in Tenant's reasonable discretion.

5. At its Savannah Campus, the College offers 14 vocational programs to approximately 550 students, including massage therapy, medical billing and coding, cosmetology, business administration, pharmacy technician, and surgical technology. Most of the College's students are "non-traditional" students. Hr'g Tr. 18. Many of the students work other jobs while pursuing their degrees or certificates, some are working parents, and approximately 20 percent are veterans of the armed services. Id. at 18, 31-32. It is not uncommon for some of the former servicemen and women to have been diagnosed with Post Traumatic Stress Disorder, or PTSD. Id. at 30, 32. The College also

employs 56 workers full-time and about 20 adjunct instructors part-time. Id. at 18.

6. The College's programs are designed to meet accreditation and licensing standards for the vocational degrees and certificates it offers. For example, the massage students must complete a certain number of hours of hands-on massage training on paying members of the public. Id. at 54-55. Likewise, the cosmetology students must practice their techniques on members of the public. Id. at 20. These customers pay the College for the services the students provide them, and they also fill out evaluation forms on the students' performance so that instructors may evaluate their skills and progress. Id. at 55.

7. Sometime in 2013, after the College was well-established in its space at the Savannah Mall, SSF entered into a lease agreement with Defendant Pole Position Raceway ("Pole Position") for the space directly above the College's campus. Defendants entered into the Pole Position Lease with the intention and understanding that Pole Position would renovate the space and use it as an indoor go-kart racetrack.

8. On November 14, 2013, counsel for the College sent a letter to SSF declaring that the College would not consent to the Pole Position Lease without assurances from SSF that Pole

Position's premises would be adequately soundproofed to prevent any disturbances to the College's campus. Dkt. no. 1-3.

9. On December 4, 2013, counsel for SSF responded to the College, stating that "[d]ue consideration was given to Pole Position's particular type of use and operation and to Virginia College's permitted use of its Premises before the Landlord made it determination to enter into the Pole Position lease without seeking your client's approval." Dkt. no. 1-4.

10. The College never consented to SSF's lease with Pole Position.

11. Before opening its track for business, Pole Position hired an acoustic consultant to conduct a sound study of its operations in July, 2014. The consultant tested the noise generated by the operation of the go-karts at several locations within the College. The study found that the normal, ambient sound level in the college was 30 decibels. When Pole Position simulated operations for purposes of the test, the sound levels rose into the 40s and were "even over 50 [decibels] on occasion . . ." Dkt. no. 17-2 ("Ehnert Aff."), p. 7. The report did not state, and the parties have since been unable to say, what specific decibel level the noise reached when it peaked in the 50s. Id.

12. Savannah City Code Section 9-2034 limits sound levels, as measured from the receiving premises, to 65 decibels for

businesses and 55 decibels for "noise-sensitive areas" Savannah City Code § 9-2034. "Noise-sensitive areas" are places where "noise-sensitive activities" are conducted, and such activities include the operation of schools. § 9-2032(15), (16).

13. No one disputes that Virginia College is a school.

14. Virginia College's mission statement states:

> The goal of Virginia College lies in its responsibility to its students, the technical and business communities, and the general citizenry. The college provides educational opportunities through curricula in business, business-related, administrative, management, technical and professional programs that are designed to prepare the student for direct entry into the job market.

"Mission Statement," Dkt. no. 23-1, p. 3.

15. Pole Position had a "soft opening" to the public on December 17, 2014.

16. Since the soft opening, students and faculty at the College have complained of significant disruptions to the learning environment on the campus caused by "continuous squealing, pounding, whirring, and rattling sounds as well as loud music and the sound of Pole Position's employees shouting instructions to Pole Position patrons." Dkt. no. 18, ¶ 28.

17. At a hearing for the instant motion, the College's President, faculty, and students provided the following unrebutted testimony as to the effects of these disruptions:

18. Dr. Kristan Ryan, President of the College, narrated a video recording that portrayed the types of sounds and vibrations emanating from the racetrack in various classrooms and spaces throughout the campus. In the video, loud bumps and other sounds can be heard throughout the campus. The video also shows how drop-down projectors, along with the images they project, shake and vibrate when go-karts pass on the racetrack above them. Dr. Ryan said that sounds and vibrations such as those shown in the video were typical, and that the shaking continues in approximately 25 minute increments, with small breaks in between. Hr'g Tr. 23-28.

19. Dr. Ryan has received several complaints about the distractions from students, as well as from members of the public who come to the College's clinical training centers. There is no "safe zone," and the entire campus is affected by the noise. Some students have personally told Dr. Ryan that they may not be able to continue at the College because of the noise going on above them. Id. at 28-30.

20. Dr. Ryan testified that the College cannot change its class schedules to accommodate Pole Position's operations because many students work during the day, and their schedules cannot be changed mid-semester. If the College were to cancel classes, the accreditation boards that oversee the College would require that the College find other schools to take its students

and would also require that the College refund moneys received from the federal government and from students. Such circumstances would be particularly burdensome to some students who receive Pell Grants, because there is a lifetime maximum to the amount of funds an individual can receive under the Pell Grant program. Id. at 32-36.

21. Dr. Ryan testified that it would be impractical for the College to move to another space. Significant alterations were made to the leased space to create a simulated pharmacy lab, salon clinic, massage studio, and other settings. Some of the College's programs rely on computer labs and specialized equipment that cannot be moved without considerable expense. Id. at 38.

22. The college operates from 7:30 a.m. to 10:30 p.m., Monday through Friday, and 9:00 a.m. to 3:00 p.m. on Saturdays. There are no classes on Saturdays, but on that day the salon clinic is open for the cosmetology students to make up for any clinic time they may have missed during the week. The school is closed on Sundays. Id. at 38-39, 45.

23. Mr. Nathan Nordstrom, Program Director for therapeutic massage at the College, testified to the effects of the racetrack on his particular program. Since Pole Position opened to the public, Mr. Nordstrom has had a hard time keeping his

students' attention. His students' grades, including those of top performers, have also slipped. Id. at 54, 60.

24. The massage clinic tries to maintain a peaceful and relaxing ambiance for its customers. Since Pole Position opened to the public, Mr. Nordstrom has tried to drown out the sound of the squealing tires by playing relaxing music. However, he has been unable to ameliorate the noise. Id. at 54-60.

25. Per Georgia's licensing requirements for massage therapists, Mr. Nordstrom's students must complete a certain number of clinical hours working with the public. To evaluate the students, the clinic collects written evaluations of the students' performance from paying massage customers. Some of the recent evaluations include complaints about the noise coming from overhead during the massages. One customer in particular, on the day before the Court conducted its hearing, complained in an evaluation: "Noise above totally distracting," and rated her experience as a 1 out of 10. This customer also noted that her least favorite part of the massage was her "inability to focus and relax due to noise and ceiling shaking." Id.

26. Ms. Stephanie Collison teaches medical assistance and related classes at the College. Ms. Collison uses projected visual aids, such as PowerPoint presentations, during her lectures. The vibrations caused by the go-kart races, though, shake the projector she uses such that students cannot read what

is on the screen. She now spends a considerable amount of time preparing print-outs of her presentations for each student because she cannot rely on the projector. Id. at 67-70.

27. Henry Walker is a student at the College studying medical assistance. Mr. Walker formerly served in the United States Army and is a combat veteran of the Gulf War. He has since been diagnosed with PTSD. The noise and vibrations coming from the racetrack make it hard for Mr. Walker to concentrate on his studies. Mr. Walker is President of the Veteran's Club on campus. The club has approximately 115 members, many of whom have also been diagnosed with PTSD and find it hard to concentrate through the noise associated with the racetrack. Id. at 72-76.

28. Adam Clark is a student at the College studying medical office administration. He served in the Navy for almost 12 years on aircraft carriers. He has been diagnosed with PTSD, and the distinct noises caused by the racetrack are reminiscent of the sounds he heard during his service on aircraft carriers. These noises have affected his ability to concentrate during class and when studying on campus. Id. at 78-84.

29. In addition to these students with PTSD, the College has submitted declarations from several students who attest that they have no disabilities or other impairments that make them unusually sensitive to sounds and vibrations. Some of the

following students' statements are typical of the sentiments expressed by this group:

- The noise is "incredibly distracting" and the distraction is affecting the students' grades. Decl. of Jana Butler, Dkt. no. 23-2, p. 2.

- "For most of the school day, the ceiling is shaking and makes everyone feel very uncomfortable that the ceiling will fall or a go-kart will fall straight through the ceiling. This problem needs to be addressed because it is affecting my learning experience at Virginia College." Decl. of Nachelle Lee, Id. at 4.

- The distraction "takes a serious toll on our learning when we cannot concentrate due to the noise and vibrations." Decl. of Tina Phothisene, Id. at 6.

- Pole Position's operations are causing noise that is "very irritating. . . Pole Position's operations are preventing me from getting my full experience at Virginia College." Decl. of Monique Brown, Id. at 16.

- "Pole Position's constant noise interrupts the communications process and is outright disruptive. Their consistent noise pollution is interfering with the commitment I made to my education. I have struggled to

learn because of Pole Position's activities." Decl. of Cauwna Bowman, Id. at 20.

30. While Pole Position has been open to the public since December 17, 2014, its "grand opening" has not yet occurred. No one disputes that volume will only increase after the publicized opening. Id. at 92, 109.

31. In addition to conducting a hearing on the preliminary injunction, the Court conducted a site visit to the Mall on January 30, 2015, accompanied by all parties and their counsel. The Court personally observed both the racetrack in operation and the sounds and vibrations at the College's campus. Id. at 106.

## CONCLUSIONS OF LAW

1. "A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter, 555 U.S. at 22.

2. A plaintiff seeking a preliminary injunction must make four showings: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Id. at 20.

13

3. The Plaintiff must clearly meet the burden of persuasion on these four issues. Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1210 (11th Cir. 2003); accord Winter, 555 U.S. at 22.

4. When a court issues an injunction, the court's order must "state its terms specifically" and must "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1); accord Schmidt v. Lessard, 414 U.S. 473, 475-77 (1974); Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1203 (11th Cir. 2001).

## I.   Likelihood of Success on the Merits

5. Plaintiff has brought claims for breach of contract and nuisance. Dkt. no. 18, pp. 11-14.

6. In order to demonstrate that it is likely to prevail on the merits, Plaintiff must show a *substantial* likelihood of success on the merits. Cable Holdings of Battlefield, Inc. v. Cooke, 764 F.2d 1466, 1474 (11th Cir. 1985) (emphasis added).

7. Georgia law defines "nuisance" as

> anything that causes hurt, inconvenience, or damage to another and the fact that the act done may otherwise be lawful shall not keep it from being a nuisance. The inconvenience complained of shall not be fanciful, or such as would affect only one of fastidious taste, but it shall be such as would affect an ordinary, reasonable man.

Ga. Code Ann. § 41-1-1. Whether a noise emanating from a lawful business is a nuisance "depends upon the nature of the locality . . . on the degree of intensity and disagreeableness of the sounds, on their times and frequency, and in all cases . . . on their effect, not upon peculiar and unusual individuals, but upon the ordinary, normal, reasonable persons of the locality." Warren Co. v. Dickson, 195 S.E. 568, 570 (Ga. 1938). Mere violation of a city ordinance does not create a private nuisance. Jillson v. Barton, 229 S.E.2d 476, 478 (Ga. Ct. App. 1975).

8. To prove a nuisance, therefore, the College must show that Pole Position's operation of a go-kart racetrack on the floor directly above its campus creates noise and vibrations with such frequency and intensity that a reasonable, ordinary person would be inconvenienced or hurt.

9. To this end, the College's evidence of its numerous students with PTSD and other conditions that make them specially sensitive to the noises and vibrations coming from the racetrack must be disregarded. Such persons are decidedly not "ordinary" persons for purposes of determining whether conduct constitutes a nuisance.

10. Nevertheless, the College has proven a substantial likelihood that it will be able to show that Pole Position is creating a nuisance because of the racetrack's effect on normal

and ordinary individuals who work, study, or receive services at the College.

11. Mr. Nordstrom testified that his students are uniformly distracted by the noise and vibrations coming from the racetrack above. He also testified that members of the public who come to the College to receive massages and give feedback to students have complained about the noise, saying that the noise has degraded their massage experiences.

12. Additionally, Ms. Collison testified that her classes are frequently disrupted by vibrations that shake the projector she uses during class. Where she could previously rely on the projector alone for her presentations, she now has to take time away from class to print copies for students to follow along with her presentations because the projected presentations are no longer effective teaching tools.

13. The Court witnessed firsthand the nature of the noise coming from the racetrack above the campus during its site visit on January 30, 2015. Such noise and vibrations similar to what the Court witnessed on January 30 are substantially likely to constitute a nuisance.

14. Because the College has shown that these ordinary individuals, their students, and their customers have been hurt, inconvenienced, and damaged by the operation of the racetrack, the College has shown a substantial likelihood that it will

prove at trial that the operation of the racetrack constitutes a nuisance.

15. The acoustic evaluation secured by Pole Position does little to rebut the College's evidence and proves that, in fact, even before the racetrack's full opening, noise levels spiked into troubling levels. The evaluation was conducted under simulated conditions in July of 2014, months before Pole Position's soft opening to the public in December. Also, the vague conclusions in the report (e.g., that the noise levels reached "into the 50s") render it incapable of showing that Pole Position's operations do not breach the Savannah Municipal Code's limit of 55 decibels for "noise-sensitive" areas, to the extent that the Code can be used as a benchmark. Finally, Pole Position suggested at the January 30, 2015 hearing that this volume would likely increase after Pole Position's grand opening.

16. Thus, the Court concludes that the College has a strong—although not impregnable—nuisance claim under Georgia law as to Pole Position's racetrack operations.

17. Because the College has demonstrated that it has a substantial likelihood of success on its nuisance claim, the Court does not assess the viability of the College's breach of contract claim at this time.

## II. Likelihood of Irreparable Harm

18. Before the Court may issue a preliminary injunction, the Plaintiff must show that irreparable harm is not merely possible, but likely. <u>Winter</u>, 555 U.S. at 22 (rejecting "possibility" standard as too lenient and writing, "[o]ur frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction." (emphasis in original)).

19. "An injury is 'irreparable' only if it cannot be undone through monetary remedies." <u>United States v. Jenkins</u>, 714 F. Supp. 2d 1213, 1221 (S.D. Ga. 2008) (citations omitted).

20. The loss of customers and goodwill has been recognized as an irreparable injury because these intangible assets are impossible to quantify, and thus do not lend themselves to remediation through money damages. <u>See, e.g.,</u> <u>Ferrero v. Assoc'd Materials</u>, 923 F.2d 1441, 1449 (11th Cir. 1991).

21. Through Dr. Ryan's detailed testimony about the particular harms the school and its students will suffer if the nuisance is not abated, the College has shown a substantial likelihood of irreparable harm.

22. Dr. Ryan testified that the school cannot cancel classes to work around the nuisance because such cancellations could cost the school its accreditation. She also testified that

the nuisance is undermining the College's educational mission. Students cannot concentrate. They are not learning. Their grades are slipping. Both of these continuing threats—the loss of the school's accreditation and its failure to fulfill its reason for existence—are harms that cannot be undone through monetary damages.

23. Dr. Ryan also testified that a vast majority of the College's students receive financial aid, such as Pell Grants. Because of the Pell Grant program's lifetime caps, students who have already used aid from Pell Grants towards one semester's tuition may not be able to re-apply for those funds at a later date if the school either closes due to the nuisance or if the students quit their studies due to the futility of trying to learn beneath an operating go-kart track. Because many of these students are "non-traditional," Dr. Ryan testified that it would be unlikely for them to get their education back on track if it is derailed by poor performance or debilitating distractions. The long-term effects that Pole Position's alleged nuisance could have on the students' educational careers, then, is another harm that cannot be undone through money damages.

24. The various declarations of Virginia College students who have no particular sensitivities to noise and sound show that ordinary persons trying to study and learn at the College are unable to concentrate and are frequently distracted by the

nuisance above their heads. Many of these students feel that their educational pursuits at the College are being compromised.

25. All of the evidence of the harm that Pole Position's alleged nuisance causes is from teachers and students who teach or take classes during the workweek. While there is evidence that the school operates a salon on Saturdays, there was no evidence presented suggesting that the operation of the racetrack will create an irreparable harm to students at the College who conduct their clinic hours in the salon on Saturdays. Additionally, no evidence was presented at the hearing as to whether the salon requires a peaceful, relaxing ambiance, as is the case with the massage clinic, to be effective. Furthermore, the College has conceded that it would not be harmed by Pole Position's operations on Sundays. As such, the College has failed to show a likelihood of irreparable harm from Pole Position's operations on the weekends (Saturday and Sunday).

26. In sum, the College has demonstrated that continued operation of the go-kart racetrack would create a likelihood of irreparable injury to both the College and its students, who are the intended beneficiaries of the College's educational mission. The school is unable to successfully complete its mission with the squealing, whirring, and bumping overhead. The educational opportunities are limited and lost by maintenance of a nuisance.

Money damages would not call them back. Plaintiffs have failed to demonstrate, however, that operation of the racetrack on the weekends is likely to cause irreparable harm.

## III. Balance of the Equities

27. When a District Court grants a preliminary injunction, it should weigh the equities carefully. Cursory analysis is insufficient. Winter, 555 U.S. at 26.

28. Several equitable considerations weigh in the College's favor. Virginia College's mission is to educate students so that they may adequately learn new vocational skills. If Pole Position's operations continue unabated, this mission will be hampered, as evidenced by Mr. Nordstrom's testimony that many of his students' grades have dropped since the races began in December. Furthermore, the College's reputation in the community as an effective vocational college could be damaged if the races continue during the College's classes and clinics.

29. Some equitable factors, though, weigh in favor of Pole Position. A preliminary injunction ordering Pole Position to cease all operations would cause tremendous loss to Defendant. During the soft opening, Pole Position's gross profits were $53,857.66 in December 2014 and $106,098.46 in January 2015, as of January 29. A complete injunction requiring Defendants to cease all operations at all times until trial is overly broad, unnecessary and not equitable.

30. Pole Position's biggest revenue-generating days are during the weekends. Conversely, most of the College's operations occur during the week.

31. Upon weighing the above factors, the Court concludes that the balance of the equities favors Pole Position insofar as the Court considers the College's request for a complete injunction. However, the balance of the equities would favor the College upon consideration of a more tailored injunction that only prohibits Pole Position from operating its track on weekdays. Such an approach would allow Pole Position to continue to operate on its biggest revenue days, and would allow the College to enjoy its premises in peace and quiet on those days when it needs it the most.

## IV. Public Interest

32. The public has a strong interest in ensuring that outside forces do not make educational centers unconducive to learning.

33. True, Virginia College is a proprietary college. It does not hold itself out as anything else. Nevertheless, it serves a worthy mission in offering a way for veterans and others already in the working world to better their career options.

34. The public has an interest in seeing vocational colleges achieve their mission, as the College helps members of the community climb the socioeconomic ladder.

35. Defendants argue, rightly so, that the public also has an interest in being able to choose from a variety of diversions. The Court has no difficulty in finding that the public's interest in maintaining a nuisance-free facility for workers to learn better job skills outweighs the public's interest in riding go-karts indoors on demand, seven days a week.

36. The Court concludes that the public interest in granting a modified injunction favors the College.

## CONCLUSION

The College has met <u>Winter</u>'s four prerequisites for a preliminary injunction as to Pole Position's racetrack operations during the week (Monday through Friday), but not as to those operations on the weekend (Saturday and Sunday). Therefore, the Court **GRANTS** the College's motion for a preliminary injunction in part and **DENIES** the motion in part. Dkt. no. 2.

The Court hereby enjoins Pole Position Raceway from conducting go-kart racing activities at all times during the workweek (Monday through Friday). This injunction does not prohibit Pole Position from conducting go-kart racing activities

at any time during the weekends (Saturday and Sunday), and neither does it prohibit Pole Position from engaging in its ancillary attractions (such as arcade games, concessions, video games, and pool tables) during the week. The injunction applies to Pole Position Raceway's location on the second floor of the Savannah Mall until the May 11, 2015 trial on the merits has concluded.

This order binds all of the parties, the parties' officers, agents, servants, employees, and attorneys.

Pursuant to Federal Rule of Civil Procedure 65(c), the Plaintiff must post bond with the Clerk of the U.S. District Court in the amount of $200,000 by February 6, 2015. At least ten percent of that amount must be presented to the Clerk in cash with the remainder satisfied by way of letter of credit.

**SO ORDERED**, this ____ day of February, 2015 in Savannah, Georgia at 4:15 o'clock p. m .

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA